IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DEBORAH A.Y.,                          )
                                       )
                    Plaintiff,         )
                                       )
v.                                     )     Civil Action No. 1:20cv0513 (RDA/JFA)
                                       )
ANDREW SAUL,                           )
Commissioner of Social Security,       )
                                       )
                    Defendant.         )
_____)

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment.  (Docket nos. 17,

22).  Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of

Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), denying

plaintiff's claim for Supplemental Security Income ("SSI") under the Social Security Act.  The

Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ")

and Appeals Council for the Office of Disability Adjudication and Review ("Appeals Council")

that plaintiff was not disabled as defined by the Social Security Act and applicable regulations

from the filing date of her application for SSI (December 13, 2016) to the date of the ALJ's

decision (February 8, 2019).[1]

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to
Local Civil Rules 5 and 7(C).  (Docket no. 11).  In accordance with those rules, this report and
recommendation excludes any personal identifiers such as plaintiff's social security number and
date of birth (except for the year of birth), and the discussion of plaintiff's medical information is
limited to the extent necessary to analyze the case.

1

# I. PROCEDURAL BACKGROUND

On December 13, 2016, plaintiff submitted an application for SSI claiming she was disabled.  (AR 31).  Plaintiff signed an "Appointment of Representative" form on March 13, 2017 authorizing William P. Gordon to represent her with respect to her claim.  (AR 105).  The Social Security Administration ("SSA") initially denied plaintiff's application on March 8, 2017. (AR 75–87, 100–04).  Plaintiff requested reconsideration of the denial on March 23, 2017 (AR 109), which the SSA denied on April 26, 2017 (AR 88–99, 109–11).  On or before May 31, 2017, plaintiff requested a hearing before an ALJ.  (AR 112).  The Office of Disability Adjudication and Review acknowledged receipt of plaintiff's request for a hearing on June 23, 2017 (AR 115) and notified plaintiff on September 27, 2018 that a hearing had been scheduled before an ALJ on December 13, 2018 (AR 132).  Plaintiff filed a second "Appointment of Representative" form authorizing John O'Neil to represent her with respect to her claim, in addition to William P. Gordon.  (AR 157).

On December 13, 2018, ALJ Raghav Kotval held a hearing in Washington, D.C.  (AR 47–74).  Plaintiff appeared in person with her attorney John O'Neil in the same hearing room as the court reporter, all of whom were in a video teleconference with the ALJ, who was in another hearing room.  (AR 50).  A vocational expert also participated by telephone.  *Id.*  Plaintiff provided testimony and answered questions posed by the ALJ and her attorney (AR 49–69), and the vocational expert answered questions from the ALJ (AR 69–72).  On February 8, 2019, the ALJ issued his decision finding that plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act from December 13, 2016[2] through the date of his decision.  (AR 31–41).

---

[2] Pursuant to 20 C.F.R. § 416.335, the ALJ used the date plaintiff filed her application for SSI, not the date plaintiff claims she became disabled, but the entire medical record was considered in making the determination.  (AR 31).

2

Plaintiff submitted a request for review with the Appeals Council on February 15, 2019, and a request for more time to submit a letter in support of her claim. (AR 24). On February 27, 2019, the Appeals Council granted plaintiff's request for more time before acting on her case. (AR 26). Plaintiff submitted a letter in support of her request for review on March 18, 2019. (AR 24, 259). The Appeals Council denied the request on November 22, 2019, finding no reason under its rules to review the ALJ's decision. (AR 4–6). As a result, the ALJ's decision became the final decision of the Commissioner. (AR 4). *See* 20 C.F.R. § 416.1481. Plaintiff requested additional time to file a civil action and was given sixty (60) days from March 7, 2020 to file a civil action challenging the decision. (AR 1–2).

On May 5, 2020, plaintiff filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). On October 19, 2020, the Commissioner filed an answer. (Docket no. 11). On November 13, 2020, the court entered an order setting the briefing schedule for the parties' cross-motions for summary judgment. (Docket no. 14). On November 20, 2020, the parties filed a joint motion to amend the briefing schedule, which the court granted on November 23, 2020. (Docket nos. 15, 16). Plaintiff filed her motion for summary judgment and memorandum in support on December 14, 2020. (Docket nos. 17–18). After obtaining a one-day extension (Docket nos. 20–21), the Commissioner filed his opposition and cross-motion for summary judgment on January 15, 2021. (Docket nos. 22–24).[3] The parties waived oral argument on their motions. (Docket nos. 19, 25). The case is now before the undersigned for a report and recommendation on the parties' cross-motions for summary judgment. (Docket nos. 17, 22).

---

[3] Plaintiff was provided the opportunity to file a reply to the Commissioner's cross-motion for summary judgment in the court's briefing order (Docket no. 14) but has chosen not to do so.

## II. STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1979)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (internal quotations and citations omitted). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). It is the ALJ's duty to resolve evidentiary conflicts, not the reviewing court, and the ALJ's decision must be sustained if supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

## III. FACTUAL BACKGROUND

### A.    Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1965 and was fifty-three (53) years old at the time of the ALJ hearing on December 13, 2018. (AR 49, 75). The highest grade of school plaintiff completed was tenth grade, and she never attained a GED. (AR 51, 191). In 2004, plaintiff worked for the Companion Animal Clinic of Gainesville, and was self-employed. (AR 176). In 2005, plaintiff was self-employed and worked for CMV Enterprises Incorporated. *Id.* In 2006, plaintiff worked for CMV Enterprises Incorporated. *Id.* There is no employment information for plaintiff in

4

2007. *Id.* In 2008, plaintiff worked for ADM Business Solutions, Inc. *Id.* In 2009, plaintiff

worked for Bowl America, Inc. and ADM Business Solutions, Inc. (AR 177). In 2010, plaintiff

worked for Bowl America, Inc. *Id.* Plaintiff was unable to identify some the companies listed as

her employers but stated that she cleaned houses both as an employee and in a self-employed

manner, and that her last job was as a snack bar cook at Bowl America. (AR 52–57).

### B.      Overview of Plaintiff's Medical History

Plaintiff has four major medical conditions that were considered in her application for

SSI: gastroesophageal reflux disease ("GERD") (AR 303–04, 339, 793), opioid dependence for

which she receives agonist therapy (AR 298–99, 554, 703, 800, 849, 1035), anxiety with related

panic disorder (AR 300, 302–04, 703–04, 782, 800, 828–29, 848, 861), and chronic obstructive

pulmonary disease ("COPD") (AR 266-67, 596–97, 793). Plaintiff's GERD has been a problem

since at least December 2003 and, among other things, it causes plaintiff to have frequent

heartburn and vomiting issues at night—potentially inflaming plaintiff's airway which could

aggravate her COPD. (AR 339, 793). For her opioid dependency, plaintiff was prescribed

Subutex and eventually switched to Suboxone for agonist therapy.[4] (AR 298–99, 554, 703, 800,

849, 1035). Plaintiff's agonist therapy medication limits her use of benzodiazepines (*e.g.*

Xanax), because of the risk of respiratory depression when those drugs are used together. (AR

849). Plaintiff has been a pack-a-day smoker for decades, and she was prescribed multiple

inhalers, a nebulizer, a corticosteroid (Prednisone), and other drugs to address her COPD

symptoms: wheezing, shortness of breath, and cough. (AR 266–67, 273–75, 594, 597, 600–01,

---

[4] Opioid agonists eliminate withdrawal symptoms and relieve drug symptoms, while partial
opioid agonists reduce cravings and withdrawal symptoms. *Opioid Agonists and Partial Agonists
(Maintenance Medications)*, NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/
publications/research-reports/medications-to-treat-opioid-addiction/how-do-medications-to-treat-
opioid-addiction-work (last visited December 15, 2020).

688, 772–73, 793).  Plaintiff was counseled on numerous occasions to stop or reduce smoking given her COPD.  (*e.g.* AR 267, 289, 1071).

Plaintiff was noted as having panic attacks as early as March 2015 for which she was prescribed Xanax and Lexapro.  (AR 302–03).  In May 2015, plaintiff was taking Subutex (agonist therapy) and seeing a psychiatrist (Dr. Todd Rankin) for her opioid dependence, who also noted plaintiff to have anxiety with related panic disorder.  (AR 298–299).  By March 2016 through at least August 2016, plaintiff's anxiety appeared to be improving and she was reducing her Xanax use.  (AR 534–547).  In November 2016, plaintiff was struggling with personal issues, and still in the process of tapering off Xanax.  (AR 548).  In February 2017, plaintiff had to face another separate personal issue, and had taken a Xanax the week prior even though she was supposed to have fully tapered off Xanax.  (AR 554–55).  In June 2017, plaintiff reported having weekly panic attacks following a car accident one month prior; she also reported no longer taking Lexapro and admitted to taking Xanax from an old prescription.  (AR 703).  Plaintiff was instructed not to take Xanax and to restart Lexapro.  *Id.*  In September 2017, plaintiff reported to her psychiatrist that she was back on Lexapro, apparently not taking Xanax, and still having panic attacks.  (AR 782).  This was plaintiff's last appointment in the medical record with Dr. Rankin, who was relocating to the Falls Church office.  (AR 783).[5]  In January 2018, plaintiff started seeing Dr. Richardson who was a specialist in addiction management.  (AR 800).

---

[5] Plaintiff started seeing Dr. Richardson in January 2018 for her agonist therapy medication (AR 800), and plaintiff was instructed to follow up with Dr. Rankin (who she had been seeing for her agonist therapy medication) regarding her psychiatric medication (AR 849, 862, 1035).  On Kaiser's website, Dr. Richardson is listed as an addiction management specialist. *See* https://mydoctor.kaiserpermanente.org/mas/providers/mauricerichardson (last visited January 25, 2021).  Whereas Dr. Rankin is listed as a general psychiatrist interested in medication management.  *See* https://mydoctor.kaiser permanente.org/mas/providers/toddrankin (last visited January 25, 2021).

### C.    Summary of Plaintiff's Medical History Prior to Filing for SSI[6]

Plaintiff had GERD as early as December 29, 2003, for which she took over-the-counter

Zantac. (AR 339). Plaintiff had a rhomboid strain (right shoulder) in December 2004, for which

she received physical therapy and was prescribed Percocet, among other things. (AR 329–30).

At least as of October 2005, plaintiff began having back pain, later diagnosed as minimal

osteoporosis and osteopenia for which she was prescribed Vicodin and physical therapy, among

other things. (AR 314–15, 317, 319). In March 2006, plaintiff was still suffering from lower

back pain, taking Vicodin multiple times a day, not doing physical therapy and she was switched

to Methadone. (AR 313). Plaintiff was not working during this period, consistent with her work

history as noted above. (AR 309). In May 2006 plaintiff's prescriptions included Oxycodone

and Omeprazole (for GERD), and it was noted that plaintiff had been smoking a pack a day for

27 years. (AR 305). There are no medical records in Administrative Record from May 2006

until March 2015.

In March 2015, Dr. Smith, a family practice doctor, noted plaintiff as a "home maker,"

engaged in limited activity, including caring for her grandmother. (AR 302). Plaintiff had

chronic insomnia and worsening panic episodes. *Id.* Plaintiff was taking Xanax and Lexapro for

her panic episodes, and Seroquel (from a family member) for insomnia. (AR 302–03). At this

point plaintiff reported that she had no anxiety, no cough or shortness of breath, no chest pain or

dyspnea on exertion, but she did have frequent heartburn addressed through over the counter

medication. (AR 303). Dr. Smith found plaintiff's chest was clear to auscultation with

---

[6] The AR contains over 900 pages of medical records primarily from Kaiser Permanente ("Kaiser") relating to plaintiff's medical treatments. This summary provides an overview of plaintiff's medical treatments and conditions relevant to her claims and is not intended to be an exhaustive list of every medical treatment.

symmetric air entry and no wheezes, rales, or rhonchi. *Id.* Plaintiff was diagnosed with GERD, and prescribed Pantoprazole; obesity; insomnia; nicotine dependence: and panic disorder for which she was prescribed Escitalopram (Lexapro) and Alprazolam (Xanax). (AR 303–04).

On her next visit with Dr. Smith on May 14, 2015, he noted plaintiff's claim that her Xanax pills were stolen by a family member and included diagnoses of panic disorder, monitoring opioid therapy, and nicotine dependence. (AR 300). On May 19, 2015, plaintiff's psychiatrist (Dr. Rankin) diagnosed plaintiff with opioid dependence for which she would receive agonist therapy. (AR 298–99). Dr. Rankin assessed plaintiff to have a Global Assessment of Functioning ("GAF") score[7] of 75, reflecting only transient and expectable reactions to psychosocial stressors and only slight impairment in social, occupational, or school functioning. *Id.* In June, August, October, and December 2015, Dr. Rankin again assessed plaintiff with GAF scores of 75 or 80 indicating only transient and expectable reactions to psychosocial stressors and only slight impairment in social, occupational, or school functioning. (AR 298, 297, 294, 287). On August 31, 2015, Dr. Smith noted that plaintiff was taking Xanax daily for anxiety and found that although plaintiff's lungs had normal air exchange with no rales or rhonchi, and normal respiratory effort with no retractions, there were wheezes on end-expiration. (AR 296–97). Dr. Smith instructed plaintiff to reduce smoking, increase exercise, and not exceed one Xanax a day. (AR 297). On December 7, 2015, when plaintiff was examined following a fall, no wheezing or other abnormality regarding plaintiff's respiratory system was found. (AR 290). The results of the x-rays following her fall revealed possible

---

[7] As discussed in *Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017), while the GAF scale was not included in the most recent edition of the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-V"), the SSA has issued guidance indicating that GAF scores are considered medical opinions but they should not be considered in isolation and any GAF score needs supporting evidence to be given much weight.

fracture of the posterior aspect of right ninth and tenth ribs, with no acute infiltrate, and no acute cardiopulmonary disease. (AR 292).

In March 2016, plaintiff reported to Dr. Rankin that she had been doing well and she had not taken Xanax in several days. (AR 534). Plaintiff stated that her mood had been good, and she had no opiate use, cravings, or withdrawal. *Id.* Her mental status exam was normal, no acute stressors were identified, and she was given a GAF score of 80. (AR 535). Her visits with Dr. Rankin on May 25 and August 1, 2016 were similar in nature with the addition that she had been sleeping well and she had no recent panic attacks, depression or other mood issues. (AR 539–41, 543–45). In November 2016, Dr. Rankin reported that plaintiff was feeling somewhat depressed, which he noted could have been due to grieving the recent death of her sister and tapering off Xanax—her last dose had been two to three days prior. (AR 548). Nevertheless, plaintiff had been sleeping well and wanted to try reducing her Seroquel use, which she and Dr. Rankin agreed to do. *Id.* At this visit Dr. Rankin assessed plaintiff with a GAF score of 65 signifying mild symptoms and mild difficulty in social, occupational, or school functioning, but generally to be functioning well. (AR 549).

On July 27, 2016, plaintiff saw Dr. Bergman for shortness of breath with exertion. (AR 580–84). Plaintiff also stated that she would have a wet productive cough while lying down, but no chest tightness or pain, and stated that she had been using an inhaler borrowed from her sister. (AR 580). Dr. Bergman did not find any wheezing or other respiratory issues and assessed plaintiff to have shortness of breath and referred plaintiff for a pulmonary function test and x-rays. (AR 581–82). Plaintiff underwent a pulmonary function test on August 2, 2016 and Dr. Hsu noted that plaintiff had difficulty doing the test and the best results were reported. (AR 585-87). The results of this test indicated moderate obstructive impairment with borderline

9

bronchodilator response. (AR 585). Plaintiff's total lung capacity was normal and the diffusing capacity of her lungs for carbon monoxide ("DLCO") was moderately decreased. *Id.* The primary diagnosis based on these test results was dyspnea. *Id.*

### D.   Summary of Plaintiff's Medical History Following Her Filing for SSI (December 13, 2016)

On December 14, 2016, plaintiff saw Dr. Kaliani complaining of shortness of breath, and it was noted that plaintiff was continuing to smoke a pack a day despite having COPD.[8] (AR 589). Plaintiff had apparently tried Wellbutrin and nicotine patches to stop smoking with no success. *Id.* Plaintiff described her shortness of breath as a chronic problem that was constantly occurring, gradually worsening, and had started about a year earlier with the associated symptom of wheezing. *Id.* Plaintiff reported that her symptoms were aggravated by exercise. *Id.* Plaintiff also reported borrowing inhalers from her sister which had provided moderate relief. *Id.* The pulmonary function test plaintiff was given in August 2016 was described as having revealed that plaintiff had a moderate obstructive impairment with borderline bronchodilator response; plaintiff's total lung capacity was normal; and plaintiff's diffusing capacity of her lungs for carbon monoxide was moderately decreased. *Id.* Dr. Kaliani found that plaintiff's breathing effort was normal with no respiratory distress or rales, but she did have occasional wheezes in the lower lobes. (AR 590). Plaintiff was extensively counseled to quit smoking and she was prescribed several inhalers. *Id.*

On January 20, 2017, plaintiff began seeing Dr. Singh instead of Dr. Smith as her primary care physician and she reported cough and nocturnal wheezing, but no shortness of breath or chest tightness. (AR 594). Dr. Singh found no wheezing or respiratory distress, and

---

[8] This is the earliest date in the medical records where plaintiff is noted as having COPD.

plaintiff's breathing effort and breath sounds were normal. *Id.* Plaintiff was able to speak in full sentences without appearing short of breath, but plaintiff did have a prolonged expiratory phase. *Id.* Dr. Singh assessed plaintiff to have COPD and prescribed Prednisone in the morning for one week. (AR 594–95). On February 1, 2017, plaintiff reported to Dr. Rankin that she had been having a difficult time because her boyfriend had a heart attack and was in the hospital, and she was still grieving her sister. (AR 668). Plaintiff had taken one Xanax about a week prior even though she was supposed to have fully tapered off given that she was taking Subutex. *Id.* Plaintiff reported that she was still smoking but had cut down to half a pack per day. *Id.* Although plaintiff was described as having situational stress and anxiety, she was also described as having minimal anxiety. (AR 669). At this visit Dr. Rankin assessed plaintiff to have a GAF score of 65 indicating mild symptoms and mild difficulty in social, occupational, or school functioning, but generally to be functioning well. *Id.*

On February 14, 2017, plaintiff denied shortness of breath and wheezing, and Dr. Singh found no wheezes or other respiratory issues, but he assessed plaintiff to have COPD. (AR 678). At plaintiff's request, he prescribed her an Albuterol nebulizer. *Id.* On February 28, 2017, plaintiff was diagnosed with pharyngitis (sore throat) (but not strep throat, shortness of breath, or any other respiratory issues other than coughing), and candida of oropharynx, for which she was prescribed Nystatin and given smoking cessation counseling. (AR 681–84). On April 6, 2017, plaintiff reported no shortness of breath or wheezing, and Dr. Singh found no respiratory issues except for chronic cough. (AR 689).[9]

---

[9] At this visit plaintiff indicated she had discovered a lump on her breast which resulted in several appointments for analysis and a surgical biopsy. These treatments lasted through June 2017 and required no further active treatment. Accordingly, those records will not be discussed in this summary.

On June 8, 2017, plaintiff was seen by Dr. Carrera in Kaiser's Psychiatry Department and reported that her mood was ok but she was having panic attacks again, about one per week since she had been in a car accident a month prior, for which she stated she was taking Xanax from an old prescription. (AR 703). Plaintiff also stated that she had stopped taking Lexapro. *Id.* Dr. Carrera instructed plaintiff not to take Xanax because she was on Subutex, and to restart Lexapro. *Id.* Plaintiff denied having symptoms of anxiety at that time and was now listed as also using Nicorette and Nicotine patches, and the inhaler Dulera. (AR 704). Plaintiff's physical activity level was described as sedentary. *Id.* Dr. Carrera reported that plaintiff was calm but restless and her mood was anxious. *Id.* Plaintiff filled out a questionnaire which measures a person's anxiety level, referred to as the GAD-7 (Generalized Anxiety Disorder) scale, which scored plaintiff to have mild anxiety.[10] (AR 705). Dr. Carrera assessed plaintiff to have an anxiety disorder and a panic disorder. *Id.*

On July 20, 2017, plaintiff saw Dr. Singh for wheezing, and she wanted a refill of Prednisone for persistent cough issues, but she was not experiencing shortness of breath, wheezing, or chest tightness at the appointment. (AR 774). Plaintiff was prescribed Wellbutrin for nicotine dependence. (AR 775). On August 25, 2017, plaintiff returned to Dr. Singh for cough and chest pain, which she reported she had been experiencing for several weeks. (AR 778–79). Plaintiff had no shortness of breath at the appointment but reported she would wheeze at night and use Albuterol, although she did not experience wheezing from exertion. (AR 779). Plaintiff was diagnosed with bronchitis. *Id.* Plaintiff reported to Dr. Rankin on September 18,

---

[10] *Generalized Anxiety Disorder Assessment (GAD-7)*, PATIENT, https://patient.info/doctor/generalised-anxiety-disorder-assessment-gad-7 (last visited January 25, 2021). Plaintiff only had minimal anxiety according to the GAD questionnaire she answered in February 2017. (AR 555).

2017 that she was still having panic attacks even after going back on Lexapro and that Seroquel was not helping her sleep as much as it had in the past. (AR 782). At this visit Dr. Rankin completed the GAD-7 questionnaire with the plaintiff which resulted in a score of 5, indicating mild anxiety. (AR 785–86). Plaintiff agreed to switch from Subutex to Suboxone to continue agonist therapy for opioid dependence. (AR 782–83). Dr. Rankin also informed the plaintiff that he was relocating to Kaiser's Falls Church office and plaintiff decided to schedule a follow up visit with a new psychiatrist in the Burke office instead of travelling to Falls Church. *Id.*

In October 2017, plaintiff was re-evaluated for her COPD by Dr. Hsu who evaluated her earlier pulmonary function test. (AR 790–96). Dr. Hsu described plaintiff as having dyspnea that is "multifactorial," and reported that while plaintiff's "COPD is definitely a problem," she did not believe plaintiff had "uncontrolled COPD." (AR 793). Dr. Hsu also reported that plaintiff's forced expiration volume might have appeared reduced because of poor effort, that plaintiff's anxiety and generalized fatigue were factors in plaintiff's COPD, that active smoking was a significant factor, and that plaintiff's GERD may have been aggravating inflammation in plaintiff's airway. *Id.* Dr. Hsu assessed that long-term prednisone therapy was not necessary, because although plaintiff's COPD would cause her shortness of breath on exertion, long-term systemic steroids would cause problems. *Id.* Dr. Hsu also noted that plaintiff's reported vomiting/regurgitation issues at night might be aggravating airway inflammation, for which she recommended plaintiff seek additional GERD medication. *Id.* Plaintiff asked Dr. Hsu for a smoking cessation prescription like Chantix, but she declined to give the prescription considering plaintiff's "anxiety/depression." *Id.* Plaintiff told Dr. Hsu that she had shortness of breath on exertion for years that had progressively worsened over the last year—with shortness of breath walking up any incline or stairs and generalized fatigue. *Id.* Plaintiff stated her activities were

13

significantly limited by her shortness of breath. *Id.* Plaintiff reported chronic cough with

sputum, intermittent rhinorrhea, heart burn, and frequent vomiting at night. *Id.* Plaintiff's

reported use of her inhalers was less than directed and Dr. Hsu explained how often plaintiff

should use them and encouraged maximal use. *Id.* Plaintiff's examination did not reveal

wheezing or any respiratory distress. *Id.* In retrospect Dr. Hsu noted plaintiff's forced expiration

volume in the pulmonary function test she took in August 2016 was "questionable." *Id.*

On January 17, 2018, plaintiff began seeing a new psychiatrist (Dr. Richardson) for

addiction management, and it was also noted for the first time that plaintiff was prescribed

Phenergan (for nausea after switching to Suboxone) and Lasix. (AR 800). Dr. Richardson noted

that plaintiff was having "middle insomnia" and panic attacks. *Id.* Plaintiff's mood was slightly

anxious, and plaintiff was given a GAF score of 60 indicating moderate symptoms and moderate

difficulty in social, occupational, or school functioning. *Id.* Plaintiff saw a doctor in Kaiser's

urgent care department for a five-day cough and wheezing on January 19, 2018. (AR 805–11).

Plaintiff had wheezing, but no shortness of breath, and plaintiff was prescribed Benzonatate and

Gabapentin for the cough. (AR 807–08). Plaintiff reported to Dr. Richardson on February 14,

2018 that she was continuing to have anxiety issues and requested a prescription for Xanax. (AR

828). Dr. Richardson's examination revealed plaintiff was alert and oriented, with good eye

contact, she was casually dressed, cooperative, her thought process was goal oriented and

logical, she had no suicidal or homicidal ideation, she was not overtly psychotic or manic, her

cognition was intact and her mood was euthymic and affect was congruent with mood. *Id.*

There was no indication that the requested prescription for Xanax was given. (AR 829).

Plaintiff saw Dr. Richardson on May 2, 2018 and again requested a prescription for Xanax for

anxiety stating that she no longer takes Lexapro. (AR 848). Plaintiff was upset that she was not

prescribed Xanax, but Dr. Richardson explained the risk of respiratory depression when using Xanax in combination with Suboxone and advised plaintiff to speak with Dr. Rankin regarding her psychiatric medication.  (AR 849).  Dr. Richardson's mental status examination was the same as the previous visit except for her mood being angry and tearful at times.  (AR 848).  Dr. Richardson assessed plaintiff to have a GAF score of 60 indicating moderate symptoms and moderate difficulty in social, occupational, or school functioning.  (AR 849).

On May 24, 2018, plaintiff saw Dr. Singh for an abdominal mass on her right side that was tender but not growing.  (AR 855).  At this visit plaintiff's pulmonary/chest examination was normal with no wheezes or rales.  (AR 856).  A sonogram of the abdomen was ordered, and Dr. Singh discussed "at length" with plaintiff her COPD, the need to stop smoking, and "how quitting smoking would improve her lung function and overall disease course for COPD".  (AR 856, 859).  The results of the sonogram revealed no abnormality and no cyst or mass was identified.  (AR 1145).

Plaintiff saw Dr. Richardson on July 25, 2018, and her "symptoms remaining" included panic attacks and middle insomnia.  (AR 861).  Plaintiff's mental status examination was normal with the exception of her mood being anxious and her insight and judgment noted as fair.  (AR 861).  Plaintiff's insomnia medication was switched from Seroquel to Trazodone.  (AR 863).  Dr. Richardson again assigned a GAF score of 60, indicating moderate symptoms and moderate difficulty in social, occupational, or school functioning, and she directed plaintiff to follow up with her psychiatrist regarding her psychiatric medication. (AR 861–62).  The last medical record concerns a September 19, 2018 appointment with Dr. Richardson.  (AR 1034–35).  At this visit plaintiff demanded a Lunesta prescription since she was not able to take Xanax, and Seroquel and Trazodone were ineffective.  (AR 1034).  Dr. Richardson did not prescribe Lunesta

because of its potential for addiction and possible interaction with Suboxone. (AR 1035). Dr. Richardson noted plaintiff's mood was angry with yelling behavior, and her insight and judgment as poor. *Id.* Plaintiff was advised to meet with Dr. Rankin regarding her psychiatric medication. *Id.* Dr. Richardson again assessed plaintiff with a GAF score of 60 indicating moderate symptoms and moderate difficulty in social, occupational, or school functioning. *Id.*

### D.     The ALJ's Decision on February 8, 2019

The ALJ concluded that plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act based on her application for SSI for the period of December 13, 2016 through the date of the decision. (AR 41). When determining whether an individual is eligible for SSI, the ALJ is required to follow a five-step sequential evaluation. It is this process the court examines to determine whether the correct legal standards were applied and whether the ALJ's final decision is supported by substantial evidence. *See* 20 C.F.R. § 416.920(a).

Specifically, the ALJ must consider whether a claimant: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform past relevant work; and (5) if unable to return to past relevant work, whether the claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 416.920(a). For the first four steps of this analysis, the claimant bears the burden to prove disability. *See* 20 C.F.R. § 416.960(c)(2). The burden then shifts to the Commissioner at step five. 20 C.F.R. § 416.960(c)(2). The regulations promulgated by the Social Security Administration also provide that all relevant evidence will be considered in determining whether a claimant has a disability. *See* 20 C.F.R. § 416.920(a)(3).

Here, the ALJ made the following findings of fact:

(1) The claimant has not engaged in substantial gainful activity since December 13, 2016;

(2) The claimant has the following severe impairments: chronic obstructive pulmonary disorder and gastroesophageal reflux disease;

(3) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) [T]he claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except the claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in an 8-hour workday; and stand and walk for 6 hours in an 8-hour workday. The claimant can occasionally climb ramps and stairs; climb ropes, ladders, and scaffolds, and occasionally crawl. The claimant can only occasionally be exposed to moving mechanical parts and unprotected heights, pulmonary irritants and poor ventilation, concentrated odors, fumes, dusts, gases, extreme cold and extreme heat, and humidity.

(5) The claimant is unable to perform any past relevant work (20 C.F.R. 416.965).

(6) The claimant was born on [redacted] 1965, and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 C.F.R. 416.964).

(7) The claimant has a limited education and is able to communicate in English (20 C.F.R. 416.964).

(8) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SRR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(9) Considering the claimant's age, education, and work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 416.969 and 416.969a).

(10) The claimant has not been under a disability, as defined in the Social Security Act, from December 23, 2016, the date the application was filed (20 C.F.R. 416.920(g)).

(AR 33–41).

## IV. ANALYSIS

### A.   Overview

Plaintiff's motion for summary judgment asserts that the ALJ committed a single error. (Docket no. 18 at 5).  Plaintiff argues the ALJ failed to accurately consider plaintiff's panic disorder in the residual functional capacity determination.  *Id.*  Plaintiff specifically asserts that the ALJ's failure to find that plaintiff's mental health impairments (anxiety with associated panic disorder) were "severe impairments" resulted in the ALJ failing to include any limitations in plaintiff's residual functional capacity based on plaintiff's mental health impairments.  *Id.*  Plaintiff claims that she suffers from anxiety and panic related disorder, and that her anxiety and panic related disorder are compounded by her COPD.  (*Id.* at 6).  Plaintiff argues the record establishes that her anxiety with related panic disorder is a severe impairment, and the ALJ's determination that this impairment "does not impose any sort of functional limitation whatsoever is improper."  (*Id.* at 7).  Plaintiff also asserts that the ALJ's non-severe finding for plaintiff's mental health impairment was inconsistent with his decision not to order a consultative examination.  *Id.*  For the reasons discussed below, the undersigned recommends a finding that substantial evidence supports the ALJ's residual functional capacity determination as to plaintiff's anxiety with related panic disorder.

### B.   Substantial Evidence Supports a Finding that Plaintiff's Anxiety with Associated Panic Disorder was Non-Severe

#### i.   *The Commissioner's Argument*

The Commissioner responds that the ALJ appropriately used the "special technique" set forth in 20 C.F.R. §§ 404.1520a, 416.920a to determine the severity of plaintiff's mental impairments, assessing plaintiff's difficulties in the four broad functional areas of (1) understanding, remembering, or applying information; (2) interacting with others; (3)

concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. (Docket no. 23 at 17). As the ALJ found that plaintiff had no more than "mild" limitations in these functional areas, the Commissioner asserts that the ALJ correctly determined that plaintiff's anxiety with associated panic disorder was non-severe. (*Id.* at 17–19).

The Commissioner also noted that plaintiff did not specifically dispute any of the ALJ's findings of "mild" in the "special technique" assessment. (*Id.* at 17–18). The Commissioner described how the ALJ consistently referred to plaintiff's mental status examinations, which generally described plaintiff's mental health status positively[11]; and considered the course and nature of plaintiff's mental health treatment, which consisted of routine medication management appointments indicating minimal limitations. (*Id.* at 19). The Commissioner also explained that no physician opined in the record that plaintiff had any mental functional limitations (including the two state agency psychological consultants), and plaintiff offered no specific mental functional limitations in her memorandum in support of her motion for summary judgment. (*Id.* at 20). As noted by the Commissioner, plaintiff has the burden of proof on this issue. (*Id.* at 16).

    ii.    *Step Two Legal Standard*

At step two of the sequential analysis, the ALJ must determine whether the claimant has a severe, medically determinable physical or mental impairment. 20 C.F.R. § 416.921. An impairment, or combination of impairments, is considered "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). An impairment is considered "not severe" when the "medical evidence establishes only a slight

---

[11] For example, plaintiff's mood was often described as good or euthymic; her thought processes were logical; and she was generally calm, cooperative, and neatly dressed; she made good eye contact; had normal speech; and had adequate cognition and generally had intact judgment and insight. (Docket 23 at 19).

abnormality or a combination of slight abnormalities which would have no more than a minimal

effect on a[] [claimant]'s ability to work even if the individual's age, education, or work

experience were specifically considered." SSR 85-28; *see also* SSR 16-3p. The claimant bears

the burden of proving that an impairment is severe. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th

Cir. 1983). "Step two of the sequential evaluation is a threshold question with a *de minimis*

severity requirement." *Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) (citing

*Bowen v. Yuckert*, 482 U.S. 137, 153–54 (1987)).

   To determine the severity of mental impairments, the ALJ must follow a "special

technique" as set forth in the regulations. 20 C.F.R. § 416.920a. First, the ALJ evaluates the

claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the

claimant] ha[s] a medically determinable mental impairment(s)." 20 C.F.R. § 416.920a(b)(1).

Second, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)."

20 C.F.R. § 416.920a(b)(2). The SSA has identified four broad functional areas in which the

ALJ rates a claimant's degree of functional limitation: (1) understanding, remembering, or

applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining

pace; and (4) adapting or managing oneself. 20 C.F.R. § 416.920a(c)(3). The ALJ assesses the

degree of limitation using a five point scale: none, mild, moderate, marked, or extreme. 20

C.F.R. § 416.920a(c)(4). If the ALJ finds that the degree of limitation is "none" or "mild," in

these four categories then generally the ALJ concludes that the claimant's impairment is not

severe. 20 C.F.R. § 416.920a(d)(1).

   If a claimant has a severe impairment, the analysis proceeds to the next step. If the ALJ

finds that no impairment meets the requirements of the listed impairments in Appendix 1, the

ALJ must determine claimant's residual functional capacity. 20 C.F.R. § 416.945(e).

     *iii.*    *Substantial Evidence Supports the ALJ's Determination that Plaintiff's*
             *Anxiety with Associated Panic Disorder was Non-Severe*

The ALJ found plaintiff had the severe impairments of COPD and GERD. (AR 33).

Accordingly, the sequential process proceeded to step three. Thus, even if the ALJ erred by not

considering plaintiff's anxiety with associated panic disorder to be severe at this stage, plaintiff

suffered no harm because the outcome at step two of the evaluation was the same—her

application for benefits proceeded to the next step. Regardless, substantial evidence supports the

ALJ's finding that plaintiff's anxiety with associated panic disorder was not severe.

     The ALJ specifically found that plaintiff's medically determinable mental impairment of

anxiety with associated panic disorder did not cause more than a minimal limitation in her ability

to perform basic work activities and was, therefore, non-severe. (AR 33). In reaching this

determination, the ALJ correctly considered the "paragraph B" (special technique) criteria—the

four broad functional areas set out in the regulations to evaluate mental disorders. (AR 33–35).

     The ALJ first addressed any functional limitations in plaintiff's ability to understand,

remember, or apply information. (AR 34). He noted that plaintiff's only mental impairment

symptoms were some indications of anxious behavior and panic attacks, for which plaintiff

received medication. *Id.* The ALJ described how plaintiff's mental status examinations

consistently indicated that plaintiff had intact cognition with logical thought processes and

appropriate thought content, with no indications of hallucinations or psychotic, suicidal, or

homicidal behaviors. *Id.* As such, the ALJ concluded that plaintiff had only a mild limitation in

this category. *Id.* Next, the ALJ considered plaintiff's ability to interact with others. *Id.* The

ALJ reviewed plaintiff's records and testimony finding that plaintiff was generally cooperative

with her healthcare providers, she lived with her 94 year-old grandmother (who gets along with

her), and she had a boyfriend. *Id.* The ALJ found plaintiff's conditions only imposed a mild

limitation in her ability to handle conflicts with others, initiate and sustain conversations, understand and remember social cues, respond to requests, and keep social interaction free of excessive irritability. *Id.* Accordingly, the ALJ determined that plaintiff had only a mild limitation in this area. *Id.*

The ALJ then discussed plaintiff's limitations in the area of concentration, persistence, or pace. *Id.* The ALJ acknowledged that plaintiff's conditions may affect her concentration to a degree. (AR 35). Plaintiff testified in the hearing before the ALJ that her anxiety affected her concentration. (AR 65). For example, by preventing her from being able to read a book because she cannot comprehend it and her mind wanders, or having to watch a program two or three times before she could understand what was happening. *Id.* However, based on plaintiff's mental status examinations in the record, her function reports, and her testimony, the ALJ found that plaintiff could perform a task with which she was familiar, sustain an ordinary routine and regular attendance, and complete a routine task in a timely manner. (AR 34–35). Based on this evidence, the ALJ concluded that plaintiff had only mild limitations in this category. (AR 35). The ALJ then addressed the fourth functional area of adapting or managing oneself. *Id.* Based on plaintiff's mental status examinations, testimony, and medical records, the ALJ found plaintiff could respond to demands, adapt to changes, distinguish between acceptable and unacceptable work performance, set realistic goals, maintain appropriate hygiene, and be aware of hazards and take appropriate precautions. *Id.* Consequently, the ALJ found plaintiff possessed only mild limitations in this category. *Id.*

In addressing each of these four areas, the ALJ cited extensively to the record, which consistently demonstrated that plaintiff was neatly or casually dressed, was able to travel, and could effectively interact with her doctors, relay information, and respond to their directions.

(AR 33–35). Furthermore, at the outset of this analysis, the ALJ noted that the evidence did not entirely support the degree of impairment alleged by the plaintiff based on her psychiatric symptoms. (AR 33). First, the ALJ explained that plaintiff's treatment notes frequently described her as relaxed and calm; despite her testimony of having a panic attack any time she was around a lot of people or in closed spaces, and that she generally just stayed home, often not even getting out of bed or showering. (AR 33, 61–62). The ALJ noted that plaintiff receives medication for her psychiatric conditions that appears to be "relatively" effective in controlling her symptoms. (AR 34). Because plaintiff's impairments caused no more than "mild" limitations in any of the four functional areas, the ALJ determined plaintiff's mental impairments were non-severe. (AR 35) (citing 20 C.F.R. § 416.920a(d)(1)). The ALJ, throughout his analysis, clearly cited to the record, noting specific facts that informed his conclusions regarding the severity of plaintiff's mental impairments. Plaintiff did not specifically critique any aspect of the ALJ's paragraph B (special technique) analysis. Instead, plaintiff only asserted that the record demonstrates she had an anxiety with related panic disorder resulting in her having ongoing issues with panic attacks. (Docket no. 18 at 7). The mere diagnosis and existence of a psychological disorder is not enough to show disability or impose limitations in a residual functional capacity analysis, plaintiff must show a "related functional loss." *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citing *Sitar v. Schweiker*, 671 F.2d 19, 20–21 (1st Cir. 1982)).

As discussed by the ALJ in the portion of his decision concerning plaintiff's residual functional capacity, the opinions of the state agency psychological consultants provide further support for the finding that plaintiff's mental conditions were no more than mild and did not require any mental limitations in that assessment. (AR 39, 79–80, 92). At both the initial and

reconsideration determination levels, the consultants opined that plaintiff had only mild

limitations pertaining to the paragraph B (special technique) functional areas.[12]  *Id.*  The ALJ

assigned great weight to these opinions because they were generally consistent with the objective

evidence.  (AR 39).

A review of the administrative hearing also demonstrates discussion of plaintiff's mental

impairments and provides insight into the rationale behind the ALJ's conclusions at step two and

in his residual functional capacity assessment.  In response to her counsel's questioning, plaintiff

explained how her anxiety with related panic disorder had worsened as she developed COPD.

(AR 61–67).  Plaintiff stated that she could not be around a lot of people or in close spaces,

otherwise she would have breathing issues or a panic attack; that she did not go out in public

often, generally stayed at home, and mainly watched television; that sometimes she would not

even get out of bed or take a shower; that she would withdraw from everyone; that her

grandmother with whom she lived would do all the cooking and cleaning, and pay someone to do

the yardwork; that she would never shop or go out in public alone out of fear of having a panic

attack; that she had difficulty concentrating (as discussed above); that she had no hobbies,

interests, or social activities that she participated in; and also had difficulty sleeping which left

her tired throughout the day.  *Id.*  The ALJ clearly considered this in his decision, referring to

plaintiff's statements during his paragraph B (special technique) and residual functional capacity

analyses.  (AR 34–35, 39).

Because plaintiff's testimony was inconsistent with the otherwise consistent evidence in

the medical record—plaintiff always appeared neatly or at least casually dressed, her mood was

---

[12] At both the initial and reconsideration levels, plaintiff was found to have no limitation
in her ability to understand, remember, or apply information.  (AR 79, 92).

often calm and euthymic, she seemed to have no significant or notable concentration issues at her appointments, and she reported traveling numerous times in the record for vacation (AR 296–99, 540, 544, 549, 555, 703–04, 784, 800, 828, 848, 861, 1034)—substantial evidence supports the ALJ's finding that plaintiff's testimony was not entirely credible. Given plaintiff's limited credibility and the objective medical evidence as elucidated by the ALJ, substantial evidence supports his determination that plaintiff's anxiety with related panic disorder was non-severe.

### C. Substantial Evidence Supports the ALJ's Decision Not to Impose Limitations Based on Plaintiff's Anxiety with Related Panic Disorder in Plaintiff's Residual Functional Capacity Assessment

#### i. *The Commissioner's Argument*

The Commissioner contends that the ALJ appropriately considered but declined to include a limitation on plaintiff's residual functional capacity to account for her non-severe mental impairment. (Docket no. 23 at 21) ("the ALJ reasonably found that [p]laintiff did not have any significant mental functional limitations"). Given this, the Commissioner asserts that the ALJ properly determined that plaintiff's anxiety with related panic disorder did not cause limitations that impacted her ability to perform work in the national economy. (*Id.* at 17).

The Commissioner described how the ALJ reviewed plaintiff's medical records, finding plaintiff's mental status to be consistently described positively, with plaintiff often having only minimal or mild anxiety, limiting the credibility of plaintiff's testimony. (*Id.* at 19). The Commissioner noted that no physician provided an opinion that plaintiff had mental functional limitations, and the two state agency psychological consultants found that she had none (both of which the ALJ explicitly relied on). (*Id.* at 20). Furthermore, the Commissioner asserts plaintiff identifies no functional loss in her memorandum in support of her motion for summary judgment, but instead merely asserts that she has been diagnosed with anxiety with related panic

25

disorder and that it is compounded by her COPD. (*Id.* at 21). The Commissioner counters that the ALJ accounted for plaintiff's COPD in his opinion, and placed a number of functional limitations on plaintiff because of her COPD, but plaintiff identifies no additional functional loss from the combination of COPD and her anxiety with related panic disorder. *Id.*

The Commissioner further contends that even if the ALJ erred in determining that plaintiff's mental health impairment did not further limit plaintiff's residual functional capacity, the error would be harmless. (*Id.* at 21). The Commissioner asserts the ALJ explained (pursuant to the vocational expert's testimony) that even if he had included mental functional limitations based on plaintiff's anxiety with related panic disorder, plaintiff would still be capable of performing work in the national economy. *Id.*

### ii.   *Residual Functional Capacity Legal Standard*

Residual functional capacity is "the most [the claimant] can still do despite her limitations." 20 C.F.R. § 416.945(a)(1). It is based "on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(3). The ALJ must consider all the claimant's impairments, including those impairments considered "not severe." 20 C.F.R. § 416.945. In assessing a claimant's residual functional capacity, the ALJ considers the claimant's ability to meet "the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 416.945(a)(4). At step four of the sequential analysis, the ALJ determines whether the claimant has the residual functional capacity to perform the requirements of her past relevant work; if the claimant does, then she is not disabled. 20 C.F.R. § 416.920(f). If the claimant cannot perform past relevant work, the analysis proceeds to step five where the ALJ considers the claimant's "residual functional capacity and [] age, education, and work experience to see if [she] can make an adjustment to other work." 20 C.F.R. § 416.920(a)(4)(v). If the claimant can adjust to other

work she will be found not disabled, but if claimant cannot adjust to other work she will be found disabled. *Id.*

To determine if the claimant can adjust to other work considering the claimant's age, education, work experience, and residual functional capacity, the ALJ uses the Medical-Vocational Guidelines, 20 C.F.R. § 404 Subpart P, Appendix 2. Under Appendix 2, § 202.00(b)

> The functional capacity to perform a wide or full range of light work represents substantial work capability compatible with making a work adjustment to substantial numbers of unskilled jobs and, thus, generally provides sufficient occupational mobility even for severely impaired individuals who are not of advanced age and have sufficient educational competencies for unskilled work.

However, if no specific rule applies, a conclusion of disabled or not disabled is not directed, but the rules and profiles in Appendix 2 still provide guidance. *See* Appendix 2, § 202.00(a).

  iii.   *The ALJ's Residual Functional Capacity Analysis is Supported by Substantial Evidence*

As noted above, plaintiff contends that the ALJ's failure to include any limitation concerning her anxiety with related panic disorder in her residual functional capacity was improper, not supported by substantial evidence, and should result in a remand so that a more accurate residual functional capacity can be determined. (Docket no. 18 at 7). The ALJ must consider all of plaintiff's medically determinable impairments, including those he concluded were not severe, in making plaintiff's residual functional capacity assessment. 20 C.F.R. § 416.945. However, "although some consideration is required, there is no requirement that the [residual functional capacity] reflect a claimant's non-severe impairments to the extent the ALJ reasonably determines such impairments do not actually create functional limitations on a claimant's ability to work." *Layson v. Comm'r*, No. SAG-12-1183, 2018 WL 2118644, at *2 (D. Md. Feb. 21, 2018) (quoting *Perry v. Colvin*, No. 2:15-cv-01145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016); *see also Presnell v. Colvin*, No. 1:12-cv-299, 2013 WL 4079214, at *4

27

(W.D. N.C. Aug. 13, 2013) ("The ALJ determined in step three that [p]laintiff's mental impairments were non-severe, and as a result, concluded that they caused little or no functional limitation which would impact the ALJ's analysis of [p]laintiff's [residual functional capacity].").  Here, although the ALJ found that plaintiff could not perform past relevant work, he still found plaintiff not disabled using Appendix 2, § 202.11 as guidance and accounting for plaintiff's additional limitations on the range of light work she could perform work based on the vocational expert's testimony.  (AR 39–40).

In his residual functional capacity analysis, the ALJ expressly considered plaintiff's anxiety with related panic disorder.  First, the ALJ compared plaintiff's testimony regarding not going out in public and staying home to her reports to her addiction management specialist that she had travel plans, went to Ocean City frequently, and would spend a month at a time at Ocean City, and to her function report in which plaintiff wrote that she independently traveled and went shopping.  (AR 39).  The ALJ also referenced plaintiff's anxiety with related panic disorder when he assigned great weight to the state agency psychological consultant opinions finding no mental functional impairments because those opinions were consistent with the objective medical evidence.  *Id.*  Accordingly, the ALJ concluded that plaintiff's anxiety with related panic disorder caused no functional limitation which would affect her residual functional capacity to perform basic mental work activities and, as such, properly did not include any such limitation to that effect.

Again, plaintiff alleges no specific functional loss in her memorandum in support of her motion for summary judgment, she merely asserts that she has been consistently diagnosed with

anxiety with related panic disorder, and that it is compounded by her COPD.[13]  (Docket no. 18 at

6).  As discussed above in Section IV.B.*iii.*, a mere diagnosis is not enough, plaintiff must allege

a functional loss as a result.  Furthermore, plaintiff does not challenge the ALJ's determination in

the residual functional analysis regarding plaintiff's COPD, and the ALJ assessed the

impairments resulting from plaintiff's COPD in extensive detail.  (AR 36–39).

Plaintiff's memorandum refers to Dr. Rankin's September 18, 2017 report (AR 782) that

plaintiff stated she was having panic attacks again despite being put back on Lexapro.  (Docket

no. 18 at 6).  However, plaintiff does not specifically challenge the ALJ's assertion at step two

that plaintiff's psychiatric medication appeared to "relatively effectively" control her symptoms.

(AR 34).  Other than one notation concerning weekly panic attacks following an automobile

accident (AR 703), the medical records do not indicate the number or severity of these self-

reported panic attacks.  The record does suggest, however, that Xanax, a benzodiazepine, was the

most effective medication for plaintiff's anxiety with related panic disorder.  When plaintiff

started taking agonist therapy medication (Subutex or Suboxone) to treat her opioid dependence,

she was also taking Xanax for her anxiety and related panic disorder.  (AR 529).  Xanax is not

---

[13] Plaintiff also asserts that the ALJ's non-severe finding for plaintiff's anxiety with related panic disorder was inconsistent with his decision not to order a consultative examination. (Docket no. 18 at 7).  The standard for determining when a consultative examination will be ordered is set out in 20 C.F.R. § 416.919a–f.  *See* 20 C.F.R. § 416.919.  The regulatory framework never requires an ALJ to order a consultative examination.  *See* 20 C.F.R. § 416.919a(a)–(b).  However, an ALJ's failure to order a consultative examination has been held to be reversible error when a consultative examination would be necessary for the ALJ to make an informed decision.  *See Huddleston v. Astrue*, 826 F.Supp. 2d 942, 959 (S.D. W.Va. 2011) (citing *Pelt v. Barnhart*, 355 F.Supp. 2d 1288, 1290–91 (N.D. Ala. 2005), and *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988).  Here, there were assessments by two state agency psychological consultants, and consistent and regular medical appointments with doctors and psychiatrists in the administrative record from 2015 to September 2018, two to three months before the administrative hearing (as detailed in Sections III.B–C of this report and recommendation, and as discussed by the ALJ in his explanation for denying a consultative examination in the administrative hearing).  (AR 73).

supposed to be used with Suboxone or Subutex because of the risk of respiratory depression (AR 849), but plaintiff and her psychiatrist agreed that she could use Xanax initially while on Subutex (AR 529). Starting in August 2016, plaintiff began tapering off Xanax. (AR 548). As of January 2017, plaintiff's Xanax prescription appeared to be discontinued (AR 596), and plaintiff was supposed to have stopped taking Xanax by February 2017. (AR 668). By June 2017, following a car accident, plaintiff reported weekly panic attacks and was taking Xanax leftover from an old prescription, but admitted to not taking her Lexapro. (AR 703). In September 2017, plaintiff was back on Lexapro, not taking Xanax, but reported having panic attacks. (AR 782).

In January 2018, plaintiff began seeing an addiction management specialist for her medication management appointments (Dr. Richardson) rather than her psychiatrist (Dr. Rankin). (AR 800). Unlike Dr. Rankin who had assessed plaintiff to have no more than mild symptoms and some difficulty in social, occupational, or school functioning, but generally to be functioning well (AR 272, 298–99, 530, 535, 548, 555), Dr. Richardson always assessed plaintiff with a GAF score of 60 indicating moderate symptoms and moderate difficulty in social, occupational, or school functioning (AR 801, 828–829, 848–49, 861–62, 1034–35).[14] By February 2018, plaintiff was requesting to go back on Xanax for her anxiety, and she does so again at her next medication management appointment in May 2018. (AR 828, 848). In fact, in the May 2018 appointment plaintiff was very angry that she did not get a Xanax prescription, and Dr. Richardson advised plaintiff to meet with Dr. Rankin but there is no evidence she did so in the AR. (AR 849). In July 2018, Dr. Richardson again advised plaintiff to meet with Dr. Rankin. (AR 861–62). At her last medication management appointment in the medical record,

---

[14] Unlike Dr. Rankin who provided some explanation for his assigned GAF scores including responses to questionnaires to access GAD7 anxiety scoring, Dr. Richardson's records provide no explanation for the consistent assessment of a GAF 60 score.

in September 2018, plaintiff "demand[ed]" that Dr. Richardson prescribe her Lunesta because she could no longer take Xanax and her insomnia prescriptions were ineffective.  (AR 1034). Plaintiff was very angry with yelling behavior, and for the first time her insight and judgment were described as poor, but Dr. Richardson would not prescribe Lunesta because of its addiction potential and possible interaction with Suboxone.  (AR 1034–35).

Although the ALJ does not specifically address plaintiff's inability to take Xanax, substantial evidence supports the ALJ's determination that plaintiff's anxiety with related panic disorder was being treated appropriately and caused no mental functional impairment on plaintiff's residual functional capacity.  The ALJ is not required to refer to every piece of evidence in his decision.  *See Reid v. Comm'r of Soc. Sec. Admin.*, 769 F.3d 861, 865 (4th Cir. 2014).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1979)).  The ALJ was clearly aware of these appointments, and what occurred, as he cited to them in his decision.  (AR 34, 39).  The ALJ even acknowledged the limits of Lexapro in addressing plaintiff's anxiety with related panic disorder, only describing plaintiff's psychiatric medication as "relatively" effective.  (AR 34). Dr. Richardson's assessment of plaintiff having moderate symptoms likely refers to "occasional panic attacks."[15]  A reasonable person could conclude that occasional panic attacks do not produce a significant functional loss or limitation on plaintiff's residual functional capacity.  The state agency psychological consultants acknowledged that plaintiff sometimes experienced panic

---

[15] DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (IV), *Global Assessment Functioning (GAF) Scale*, DSM-IV-TR 34, https://www.albany.edu/counseling_center/docs/GAF.pdf#:~:text=Global%20Assessment%20of%20Functioning%20%28GAF%29 %20Scale.%20%28From%20DSM-IVTR%2C,in%20functioning%20due%20to%20 physical%20%28or%20environmental%29%20limitations (last visited January 25, 2021).

attacks, but similarly applied no restrictions on plaintiff's residual functional capacity based on
her anxiety with related panic disorder. (AR 80, 92). Plaintiff does not allege that her panic
attacks have worsened since those opinions were made, nor does she specifically dispute those
opinions. Neither of plaintiff's two treating psychiatrists (Dr. Rankin and Dr. Richardson)
provide any opinions concerning specific functional limitations on plaintiff's ability to work.

Plaintiff also makes no argument based on her GAF scores. GAF scoring was not
included in DSM-V because of "its lack of conceptual clarity" and "questionable psychometrics
in routine practice." *See Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017) (quoting Am.
Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013).
Although GAF scores are still considered by ALJs, they cannot be used to "raise" or "lower"
someone's level of function, and "[u]nless the clinician clearly explains the reasons behind [the]
GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal
picture of . . . mental functioning for a disability analysis." *Id.* (quoting Soc. Sec. Admin.,
Administrative Message 13066 (July 22, 2013)). A reasonable person could conclude, despite
plaintiff's GAF rating according to Dr. Richardson, that plaintiff had no mental functional
limitations in her residual functional capacity given the other medical evidence (including the
narratives in plaintiff's mental status checks) and the determinations of the state agency
psychological consultants. Given the lack of any explanation by Dr. Richardson concerning the
GAF scores and the inconsistency with the considerably higher and supported GAF scores by Dr.
Rankin, the ALJ did not err in relying on Dr. Richardson's assignment of GAF scores.

The ALJ analyzed the evidence, including plaintiff's own statements, opinion evidence,
and treatment records, to support his finding that plaintiff's anxiety with related panic disorder
was non-severe and caused no more than minimal limitations to perform basic mental work

activities. He explained how his assessments were supported by the record, and a reasonable person could find the evidence in the record was adequate to support those assessments. Accordingly, substantial evidence in the record supports the ALJ's determination that plaintiff's anxiety with related panic disorder did not require any limitations in her residual functional capacity.

> iv.    *Even if the ALJ Erred in Not Imposing Limitations on Plaintiff's Residual Functional Capacity Based on Plaintiff's Anxiety with Related Panic Disorder, it was Harmless Error*

The ALJ noted in his decision that the vocational expert testified that her answer regarding the jobs available in the national economy for plaintiff would not have changed if the following limitations were applied to plaintiff's residual functional capacity: "simple, routine tasks, not at a production pace, can only occasionally interact with supervisors, co-workers, and the public, and can only occasionally adjust to changes in the workplace setting." (AR 41 n.1). The Commissioner, noting the above, asserts the ALJ's final determination would not have changed even if he had applied restrictions to plaintiff's residual functional capacity based on her anxiety with related panic disorder. (Docket no. 23 at 16) ("[p]laintiff has merely identified a harmless error that cannot support remand").

"[C]ourts have applied the harmless error analysis. . . [where] remand 'would merely be a waste of time and money.'" *Huddleston v. Astrue*, 826 F.Supp. 2d 942, 955 (S.D. W.Va. 2011) (citing *Jenkins v. Astrue*, 2009 WL 1010870 at *4 (D.Kan. Apr. 14, 2009). "Remand of a procedurally deficient decision is not necessary [unless the plaintiff was] 'prejudiced on the merits or deprived of substantial rights.'" *Id.* (quoting *Connor v. United States Civil Service Commission*, 721 F.2d 1054, 1056 (6th Cir. 1983); *see also Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (Hall, J., concurring) (finding the ALJ's initial error harmless because he would

have reached the same result regardless of the error).  Plaintiff still would have been found not disabled even if the ALJ had imposed additional restrictions on plaintiff's residual functional capacity based on her anxiety with related panic disorder.  Plaintiff still would have been able to perform jobs present in large numbers in the national economy.  If there was any error in not applying restrictions based on her anxiety with related panic disorder, it was therefore harmless, and remand would still not be appropriate.

## V.  CONCLUSION

Based on the foregoing, it is recommended that the court finds that the Commissioner's final decision denying plaintiff benefits for the period of December 13, 2016 through the date of the ALJ's decision is supported by substantial evidence, and that the proper legal standards were applied in evaluating the evidence.  Accordingly, the undersigned recommends that plaintiff's motion for summary judgment (Docket no. 17) be denied, the Commissioner's motion for summary judgment (Docket no. 22) be granted, and the final decision of the Commissioner be affirmed.

## NOTICE

Failure to file written objections to this report and recommendation within 14 days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this _____ day of February, 2021.

/s/

John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

34